UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

RECEIVED
USDC CLERK, CHARLESTON, SC
2005 AUG -3  A 10: 12

| | |
|---|---|
| Fatisha Drayton, on her own behalf,<br>and as Next Friend of her children,<br>Mulik Simmons and Mulika Simmons,<br><br>    Plaintiff,<br><br>  -vs-<br><br>Inergy Propane, LLC d/b/a Estill Gas<br>of Hardeeville,<br><br>    Defendant and<br>   Third Party Plaintiff,<br><br>  -vs-<br><br>Marc C. Snyder d/b/a T.W. Burrows<br>Realty,<br><br>    Third Party Defendant,<br><br>  and<br><br>James Scott and Gina Scott, both<br>individually and d/b/a Gina Scott<br>Realty; and Ginco Enterprises, Inc.,<br><br>   Third Party Defendants and<br>    Fourth Party Plaintiffs,<br><br>  -vs-<br><br>Best Buy, Inc.,<br><br>   Fourth Party Defendant, | Civil Action No. 9:04-87-SB<br><br>**O R D E R** |



INTRODUCTION

This matter originally came before the Court on the complaint of Plaintiff Fatisha Drayton (the Plaintiff) on behalf of herself and her children, Mulik Simmons and Mulika Simmons, against Defendant Inergy Propane, LLC. d/b/a Estill Gas of Hardeeville (Inergy). On October 9, 2003, the Plaintiff and her children suffered severe burns as a result of an explosion that occurred in their rental home. A change from a gas stove to an electric stove prior to the Drayton's tenancy left the gas line uncapped. The simple action by the Plaintiff of turning on the heat in the house ignited the property into an inferno. In addition to the injuries suffered by the Plaintiff and her children, the fire destroyed all of their property. The Plaintiff and Inergy, which controlled the gas line leading into the home, reached a settlement of approximately four and one-half million dollars ($4,500,000).

Thereafter, Inergy filed a Third Party Complaint against Mark C. Snyder d/b/a T.W. Burrows Realty (Snyder) and James and Gina Scott, individually and d/b/a Gina Scott Realty and Ginco Enterprises, Inc. (the Scotts), seeking indemnification. Inergy asserts that Snyder and the Scotts, realtors who maintained the property during the relevant period, were responsible for the gas line remaining uncapped. Snyder served as the real estate agent for the property beginning in the summer of 2002. He managed the property and procured the contractor who made certain renovations. Inergy contends that the change in stoves from gas to electric was a detail about which Snyder, in its managerial role, should have known and should have alerted Inergy.

The Third Party Complaint brought against the Scotts centers around much



the same claim. On February 25, 2003, the Scotts were engaged to sell or lease the property in question. It was leased in June of 2003 by the Plaintiff, and James Scott allegedly entered the premises of the property prior to the fire. Inergy contends that this act specifically, and the Scotts' involvement with the property generally, created a duty owed by Scott to the Plaintiff to ensure that the property was, in fact, habitable and safe.

The Scotts filed an amended response to Inergy's Amended Third Party Complaint on May 19, 2005, asserting a "Third Party Complaint" against Best Buy, Inc.[1] This claim is based upon the fact that Best Buy sold and installed the electric stove that replaced the gas stove at the property in question. The Scotts assert that Best Buy, via its agents who delivered and installed the stove, should have noticed and secured the uncapped gas line. Inergy has subsequently filed a Motion to Strike the Third-Party Complaint on the grounds that it is untimely and would prejudice Inergy by preventing its case against Snyder and the Scotts from being tried as scheduled.[2] The Scotts have responded to this motion.

In addition, on April 11, 2005, Snyder filed a Motion for a Protective Order seeking to preserve attorney-client/work product privilege and to deny opposing counsel access to certain communications between Snyder and his attorney. Inergy, on April 19, 2005, filed a Rule 37 Counter-Motion asking the Court to compel

---

[1] As a Third-Party Defendant already, the Scotts' indemnification action should be styled as a Fourth-Party Complaint.

[2] The scheduling order currently in effect places the trial at this Court's June 2005 term. At a status conference in June, the Court agreed to try the case in August to accommodate counsel's schedule. Recently, on July 1, Snyder filed a request for continuance on several grounds, including the potentiality for insurance coverage.

3

disclosure of these communications. Snyder filed its reply on May 31, 2005. These matters are now ripe for decision.

## DISCUSSION

### Fourth Party Complaint

The issue of timeliness as it relates to the Scotts' filing of a Fourth Party Complaint against Best Buy is the primary assertion raised by Inergy in their Motion to Strike. Gina Scott and Gina Scott Realty were added as Third Party Defendants on June 30, 2004. On April 21, 2005, Inergy received permission to amend the Third Party Complaint to add James Scott as a party, as well as Ginco Enterprises, Inc., the holding company for Gina Scott Realty. The Scotts filed an answer to the Amended Third Party Complaint on May 11, 2005. They then filed an amended answer on May 23, 2005, in which they added the claims against Best Buy. Jury selection in the case was set to begin on or about June 27, 2005.

According to Rule 14 of the Federal Rules of Civil Procedure:

> At any time after the commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff. The third-party plaintiff need not obtain leave to make the service if the third-party plaintiff files the Rule 14 of The Federal Rules of Civil third-party complaint not later than 10 days after serving the original answer. Otherwise the third-party plaintiff must obtain leave on motion upon notice to all parties to the action.



The lapse of time between the Scotts' original answer and their Fourth Party Complaint is obviously in excess of the ten-day period afforded an individual by Rule 14, and the Scotts did not seek leave of the Court to do so. Inergy claims that it would be prejudiced by the Court allowing this untimely filing so close to trial. It

4

argues that the Scotts were aware of Best Buy's role in the sale, delivery, and installation of the stove through depositions dating back to June 16, 2004, and that this is merely a delay tactic meant to disrupt the litigation. The Scotts maintain that no prejudice will result in adding Best Buy or in continuing the case to the September, 2005, term. They also argue that Inergy's addition of James Scott on April 21, 2005 restarted the response period under Rule 14.

The decision in <u>Consolidated Rail Corp. v. Metz</u> 115 F.R.D. 216, 219 (S.D.N.Y. 1987), speaks directly to the issue of allowing untimely Third Party Complaints:

> Factors which the Court should consider in making such a determination include (1) whether or movant deliberately delayed or was derelict in filing its motion; (2) whether prejudice would result to the third party defendant; (3) whether the trial of the principle action would be delayed or unduly complicated; and (4) whether the proposed third party complaint states a claim under which relief may be granted.

In the instant case, there is nothing that speaks definitively as to the motive or intentions of the Scotts in filing when they did. The central argument made by Inergy against the inclusion of Best Buy is the potential disruption to the litigation schedule. However, a change of the trial date from August to late September would create minimal inconvenience, and would limit any disruption which may arise due to the inclusion of Best Buy. This measure, when coupled with the benefit afforded all parties by the inclusion of Best Buy, would negate any potential disruption to the litigation and would also stymie any potential prejudice Best Buy might face with the Fourth Party Complaint being filed so close to the trial as currently scheduled, another concern raised in the <u>Metz</u> case. <u>Metz</u>, 115 F.R.D. at 219.



5

The fourth factor mentioned in the <u>Metz</u> case requires that the third party complaint provide at least the potential of a meritorious claim. <u>See id</u>. In the instant case, Best Buy's direct involvement with the installation of the stove and disconnection of the gas line clearly meets this standard.

Inergy has not carried its burden in demonstrating that this Court, in its discretion, should not permit the Fourth Party Complaint. Thus, Inergy's motion to strike is denied, and the addition of Best Buy as a Fourth Party Defendant is approved. As such, the scheduling order must be amended to move the trial of this case to a later term of this Court. The parties shall submit an agreed schedule by which Best Buy may receive and take discovery.

*Protective Order*

Snyder, in his Motion for Protective Order, seeks to preclude any access to certain communications with his attorney, E. Mitchell Griffith. At Snyder's deposition, counsel for Inergy asked what materials Snyder used to prepare for the deposition. Snyder responded that he reviewed a summary of the Scotts' deposition which was prepared by Griffith. Griffith objected to turning over this summary, on the grounds of privilege.

The argument made by Inergy is that Snyder, after having used the summary as a tool of preparation for his own deposition, somehow surrendered the inherent right to privilege accompanying any subjective communication between attorney and client. The Court finds this argument to be wholly lacking of merit. The summary, subjectively arranged and, consequently, commented upon as it was by Griffith, is a clear illustration of the very document that the work product privilege exists to



6

protect.

The ability of an attorney to prepare for litigation and communicate to his client his own subjective thoughts and impressions of various aspects of litigation is a sacrosanct right in the American judicial system, as clearly outlined in Federal Rule of Civil Procedure 26(b)(3):

> (3) *Trial Preparation: Materials.* Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking the discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

This Rule, even when the required showing is made for factual materials, supplies complete ironclad protection to the subjective legal impressions an attorney may communicate to his client prior to trial:



> The work product privilege protects an attorney's work done in preparation for litigation. It is premised on the idea that "[n]ot even the most liberal of discovery theories can justify unwarranted inquires into the files and the mental impressions of an attorney." The privilege encompasses both "fact" work product and "opinion" work product. Fact work product, which consists of documents prepared by an attorney that do not contain the attorney's mental impressions, "can be discovered upon a showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship." Opinion work product, which does contain the fruit of an attorney's mental processes, is "more scrupulously protected as it represents the actual thoughts and impressions of the attorney."

7

<u>In Re Grand Jury Proceedings</u>, 401 F.3d 247, 250 (4th Cir. 2005) (quoting <u>In Re Grand Jury Proceedings</u> 33 F.3d 342, 348 (4th Cir. 1994); <u>Hickman v. Taylor</u>, 329 U.S. 495, 510 (1947)).

Inergy attempts to sidestep the work product privilege by raising Federal Rule of Evidence 612, as it was applied in the case of <u>Nutramax Labs, Inc. v. Twin Labs, Inc.</u>, 183 F.R.D. 458 (D. Md. 1998). This rule provides guidelines for the introduction of documents used by a witness to refresh that witness' memory:

> [I]f a witness uses a writing to refresh memory for the purpose of testifying, either –
> (1) while testifying, or
> (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice,
> an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions that relate to the testimony of the witness.

Fed. R. Evid. 612. The first potential situation the rule mentions, the use of a document to refresh one's memory while testifying, is completely inapplicable in the instant case.

Inergy asserts its claim for the waiver of privilege based upon the application of subsection (2), the use of a document to refresh one's memory prior to testifying. It argues that the <u>Nutramax</u> decision employs the "in the interests of justice language" of Federal Rule of Evidence 612 to force the production of preparation materials, even if they are protected under work product. An analysis of the case is necessary.



The court first identified the competing interests involved:

In preparing to defend depositions in cases where substantial

8

document production has taken place, no competent counsel can afford to ignore reviewing with witnesses the documents which relate to critical issues. During a deposition, counsel questioning a witness will seldom fail to ask the witness about what he or she did to prepare for the deposition, and the identity of any documents reviewed for this purpose. Most often, this inquiry is not resisted by counsel defending the deposition, because the documents have already been produced to the opposing counsel. However, where, as here, many thousands of pages of documents have been produced and counsel have analyzed them and selected a population of "critical documents" relevant to case dispositive issues, a deposition question aimed at discovering what documents were reviewed to prepare for a deposition may draw an assertion of the work product doctrine, and an instruction not to answer. In response, the deposing attorney may contend that if the witness used the documents to prepare for the deposition, then work product immunity has been waived, and [Rule of Evidence] 612 requires the production of the documents. As will be seen, there is support in the case law and treatises for both sides of this argument, and it has been recognized that there is a clear conflict between [Rule] 26(b)(3), which codifies the work product doctrine, and [Rule of Evidence] 612, which has been held to apply during depositions by virtue of [Rule] 30(c).

Id. at 461-62 (citations and footnotes omitted). After a lengthy analysis of "fact work product" and "opinion work product," id. at 462-63, the circumstances under which each could be waived, id. at 463-67, and the applicability of Rule 612 in depositions, id. at 467-68, the court applied a three-part test to determine whether and to what extent work product materials were discoverable as a result of their use in preparation for testimony:

As a threshold matter, three foundational elements must be met before Rule 612 is applicable with respect to documents reviewed by a witness to prepare for a deposition: (1) a witness must use a writing to refresh his or her memory; (2) for the purpose of testifying; and (3) the court must determine that, in the interest of justice, the adverse party is entitled to see the writing. The first element insures that the writing is relevant to an attempt to test the credibility of the deponent. The second element safeguards against use of Rule 612 "as a pretext for wholesale exploration of an opposing party's files" and insures "that access is limited only to those writings which may fairly be said



9

in part to have an impact upon the testimony of the witness," because only writings which actually influenced a witness's testimony are of utility in impeachment and cross-examination. If the first two elements are not met, then the inquiry ends, as Rule 612 is inapplicable. However, if the first two elements are met, then it safely may be concluded that the documents have been put to a testimonial use for purposes of work product doctrine analysis. Whether disclosure is required then turns on the third element of Rule 612.

Id. at 468 (citations omitted). The Court assumes, without deciding, that the first two elements are met.

Under the third element, the Nutramax decision outlined nine factors to consider in balancing the competing interests: (1) the status of the witness; (2) the nature of the issue in dispute; (3) when the events took place; (4) when the documents were reviewed; (5) the number of documents reviewed; (6) whether the witness prepared the document(s) reviewed; (7) whether the documents reviewed contain, in whole or part, 'pure' attorney work product, such as discussion of case strategy, theories or mental impressions, which would require redaction or favor nondisclosure; (8) whether the documents reviewed previously have been disclosed to the party taking the deposition, as part of a Rule 34 document production, or otherwise; and (9) whether there are credible concerns regarding manipulation, concealment or destruction of evidence. Id. at 469-70.

After applying these factors to five witnesses, the Nutramax court concluded that several of the documents used to prepare these witnesses should be turned over to the opposing party. Id. at 470-74. Applying the same factors to the deposition summary prepared by Griffith for Snyder's deposition, the Court concludes that the summary should not be turned over to Inergy. There are several



distinctions between the witnesses and documents in <u>Nutramax</u> and those at issue here. First, and perhaps most important, is Snyder's status as a <u>fact only</u> witness. The <u>Nutramax</u> court made much of a witness's status as a corporate designee under Rule 30(b)(6), indicating that "his testimony was not limited to facts personally known to him, but also to those reasonably available to [the organization]." <u>Id.</u> at 472. "Because of this, the defendants had a heightened need to discover the factual basis for his testimony." <u>Id.</u> "There is a greater need to know what materials were reviewed by expert and designee witnesses in preparation for deposition since the substance of their testimony may be based on sources beyond personal knowledge." <u>Id.</u>

Because Snyder was not called as an expert or designee witness, he could only testify to facts within his personal knowledge, <u>see</u> Fed. R. Evid. 602., and because Snyder's involvement with the property preceded that of the Scotts without overlap, what the Scotts may or may not have done would be outside the scope of his personal knowledge. In addition, even if Snyder were to testify that he had firsthand knowledge of what the Scotts did during their management of the property, Inergy's best remedy would be to effectively cross-examine him on the basis of that knowledge. If it were determined that Snyder had the opportunity to obtain such knowledge firsthand, the testimony would be proper. If, on the other hand, Snyder admitted he had no firsthand knowledge, and only learned of certain facts by reading the Scotts' deposition, he would be adequately impeached and discredited



11

with respect to this testimony.[3]

Another important factor in turning over work product via Rule 612 is who prepared the documents reviewed. "If the witness prepared the document(s) reviewed in preparation for the deposition, particularly if they were prepared in the ordinary course of the events underlying the dispute, and not in anticipation of litigation, there may be a greater need for disclosure than if the witness reviewed documents prepared by others." Id. at 470. Also determinative was "whether the documents reviewed contain, in whole or part, 'pure' attorney work product, such as discussion of case strategy, theories or mental impressions, which would require redaction or favor nondisclosure." Id. Here, it is undisputed that Snyder did not prepare the summary in question, and that it was prepared by Griffith, his attorney. Any commentary on trial strategy or other mental impression with regard to what was said in the Scotts' deposition is clearly "pure" opinion work product and should not be disclosed.

This is particularly true where the non-opinion portion of the documents are available to opposing counsel. "It may be argued that, if the deposing attorney already has received the documents during the litigation, there is no reason to order their production a second time, for the only purpose this would serve would be to disclose, indirectly, the mental impressions of the attorney who selected the documents to review with the witness." Id. Here, it was Inergy who had taken the Scotts' deposition, so it obviously had access to the transcript upon which the

---

[3] Additionally, this testimony would most probably be inadmissible hearsay.

summary was based. The only possible reason to then request the summary would be to look into Griffith's mental impressions of the Scotts' testimony. Moreover, the deposition was not "so voluminous or technical that the party receiving [it] cannot readily be expected to grasp their significance." Id.

Inergy's strongest argument is that the summary may be intended to correlate Snyder's version of events with those already outlined by the Scotts, which has some merit under Nutramax. E.g., id. ("The ability of a witness to perceive, remember, and relate events is fair game for cross examination, and a deposing attorney has a legitimate need to know whether the witness is testifying from present memory, unaided by any review of extrinsic information, present memory 'refreshed' by reference to other materials, or really has no present memory at all, and can only 'testify' as to what is memorialized in writings prepared by the witness or others."); id. ("If the court believes that there may have been inappropriate conduct affecting either testimonial or documentary evidence in the case, and the documents demanded under Rule 612 relate to these concerns, then disclosure may be required."). This concern, however, is overridden by the weight of the factors favoring non-disclosure. As noted, Inergy already had in its possession the Scotts' version of events, and effective cross-examination could expose what Snyder knew and how he knew it. Keeping in mind the fact that Snyder's attorney prepared the summary he reviewed, and the need to honor the attorney-client privilege via the work product doctrine is simply too strong to warrant giving Inergy the information it seeks.



13

<u>CONCLUSION</u>

Based on the foregoing, it is

ORDERED that Inergy's Motion to Strike Third Party Complaint is denied; that the Scotts may proceed with their Fourth Party Complaint against Best Buy; that the scheduling order in this case is amended to place the matter for trial on or after September 20, 2005; that the parties shall submit an amended scheduling order providing Best Buy a reasonable time to conduct discovery; that Snyder's Motion for Protective Order is granted; and that Inergy's Motion to Compel is Denied.

**IT IS SO ORDERED**.

Sol Blatt, Jr.
Senior United States District Judge

August 2, 2005
Charleston, S.C.

#14

14